## NIKOLAOS PANOUSOS AND SANDRA PANOUSOS, ADMINISTRATORS OF THE ESTATE OF NICOLE PANOUSOS

v.

## ROBERT M. ALLEN, M.D., ET AL.

Record No. 920529

January 8, 1993

Present: All the Justices

*John D. Quinn (Fehrenbacher, Sale, Quinn & Deese*, on briefs), for appellants.

*George A. McAndrews (Gary A. Godard; Godard, West & Adelman*, on brief), for appellees.

JUSTICE WHITING delivered the opinion of the Court.

We must decide whether the evidence in this negligence case supports the granting of a superseding cause instruction.

Nicole Panousos, a four and a half month old infant, died following an abdominal operation at the Fairfax Hospital. Alleging medical malpractice, Nikolaos and Sandra Panousos, Nicole's parents and administrators of her estate, sued Dr. Robert M. Allen, a radiologist, and his employer, Fairfax Radiological Consultants, P.C. The trial court entered judgment upon a jury verdict for the defendants.

We granted this appeal limited to the question whether the evidence supports the granting of the following instruction, tendered by the defendants:

An intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between the defendant's negligent act and the plaintiff's injury. An intervening cause breaks the chain of events so that the defendant's original negligent act is not a proximate cause of the plaintiff's injury in the slightest degree.

As we will note later, in any event, the instruction as written is erroneous.

■ Because the jury returned a verdict for the defendants, we assume it applied and relied upon the principles articulated in the instruction in reaching its verdict, *Reams v. Doe*, 236 Va. 237, 238, 372 S.E.2d 405, 406 (1988); *Norfolk & W. Ry. v. White*, 158 Va. 243, 256, 163 S.E. 530, 534-35 (1932), and we further assume that the jury found Dr. Allen was negligent, but that a superseding cause broke any connection between his negligent act and the subsequent death of his patient. Accordingly, we will state the facts and the reasonable inferences deducible therefrom that support the theory of this instruction.

Nicole, then acutely ill, was admitted to the hospital with a large, distended abdomen. For some days previous to her admission, Nicole had experienced diarrhea, vomiting, and fever, and had refused to nurse, although this was her sole form of fluid and nutrition.

In examining Nicole, Dr. Earl Hodin, a pediatric surgeon, noticed that her abdomen "seemed to contain a large mass." Before making a diagnosis and deciding whether to delay the operation for 24 hours or to operate immediately, Dr. Hodin ordered a sonogram. A sonogram is a diagnostic ultrasound examination employing equipment that projects a picture of internal organs on a television screen by the use of high-frequency sound waves. The timing of the operation was to have important consequences for Nicole, as we shall see later.

Dr. Allen performed the sonogram and other tests and advised Dr. Hodin that there were two cystic (fluid-filled) masses in Nicole's abdomen, but that neither mass was the bladder. Had Dr. Allen advised Dr. Hodin that the larger mass was the bladder, Dr. Hodin

would have attempted to drain the bladder by catheterization and then assessed Nicole's condition before deciding whether to delay surgery.

After receiving Dr. Allen's report, Dr. Hodin performed emergency surgery upon Nicole. The surgery took approximately four hours and forty-five minutes. During surgery, Dr. Hodin discovered that Dr. Allen had misinformed him, and that the large mass in Nicole's abdomen was her bladder. Dr. Hodin drained approximately one liter of urine from the bladder. This was approximately 10% of Nicole's entire body weight and more fluid than her total blood volume.

Dr. Hodin also found, and excised, a fluid-filled tumor (the smaller mass observed by Dr. Allen on the sonogram), which was pressing against Nicole's urethra. This tumor had blocked the flow of urine from her bladder, causing it to swell. Nicole went into cardiac arrest the next day and died the following day.

■ The plaintiffs' expert witnesses, Dr. Arthur Maron, a pediatrician, and Dr. Richard B. Karsh, both a diagnostic radiologist and a pediatric cardiologist, reviewed Nicole's medical records after the operation. Dr. Karsh characterized Dr. Allen's tests as insufficient and testified that Dr. Allen should have performed other tests, which would have identified the large mass as the bladder. Both doctors testified that had Dr. Allen reported to Dr. Hodin that the large mass was the bladder, the urine enlarging Nicole's bladder could have been drained and the surgery could and should have been postponed.

According to Dr. Karsh, substantial changes in the fluid levels in infants have important consequences in monitoring their levels of hydration, in normalizing their electrolytes (chemicals in the blood responsible for normal cellular function), and in caring for infants. One of the defendants' expert witnesses, Dr. Bradley Rodgers, a pediatric surgeon, testified that in the surgery Dr. Hodin was to perform, there would be ''a lot of fluid shifts,'' and that such shifts would continue for 8 to 12 hours following the operation.

Dr. Maron testified that had Nicole been given the opportunity to resume breast feeding to improve her protein nutrition, her physical condition would have improved within several hours. Both Drs. Marion and Karsh concluded that had the operation been delayed, Nicole would not have been subjected to the higher risks associated with emergency surgery upon acutely ill infants.

Noting Nicole's depleted nutritional state and her weakened physical condition, Dr. Maron further testified that

[t]here were dramatic shifts in the child's fluid balance secondary to surgery and secondary to the drainage from the bladder. There were electrolyte disturbances which means that the ability of the child to compensate for deficiencies and surpluses of various salts and electrolytes in the bloodstream were affected. There was a problem with hydration or fluid maintenance on the part of the child, because it was very difficult to tell whether the urination was secondary to having had an obstruction previously or whether [it resulted from] not getting enough fluids. Therefore, fluids were given that might have been excessive in error because of the fact that we're not aware of the. true hydration state of the child.

These number of things cumulatively resulted, I believe, in congestive heart failure, a weakening of the heart muscle and eventually cardiac arrest which occurred in the early morning of the 6th.

The cardiac arrest was of such a nature and electrolytes were of such a disturbance that the cardiac arrest was irreversible in spite of the heroic measures taken to restore the child's cardiac status.

■ Defendants' expert, Dr. Rodgers, testified that "[t]here's no objective evidence to support any of the four primary suspects in this case," the three causes of death described by Doctors Maron and Karsh and another cause initially suspected by Dr. Rodgers. Dr. Rodgers' conclusion was that "I don't think there's [enough] data here to support any particular cause of death over another." The defendants reason from this testimony and the testimony of Drs. Maron and Karsh that the issue of superseding cause had thus been raised.

■ Neither party cites any case in which we have considered the sufficiency of the evidence necessary to support a superseding cause instruction. Defendants recognize that they have the burden of going forward with evidence of superseding cause.

■ We have differentiated intervening and superseding cause in the following language:

There may, of course, be more than one proximate cause of an event. And not every intervening cause is a superseding cause. In order to relieve a defendant of liability for his negligence, negligence intervening between the defendant's negligence and the injury "must so entirely supersede the operation of the defendant's negligence, that it alone, without the defendant's [negligence contributing] thereto in the slightest degree, produces the injury."

*Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 131, 267 S.E.2d 143, 147 (1980) (quoting *City of Richmond v. Gay*, 103 Va. 320, 324, 49 S.E. 482, 483 (1905)). Hence, the instruction at issue is more precisely described as a superseding cause instruction.

In support of their contention that they have met their burden of going forward with the evidence on this issue, the defendants first note Dr. Rodgers' rebuttal of the causation testimony of the plaintiffs' experts. The defendants then conclude that "[l]ogic dictates that if none of the factors postulated by Appellants' trial experts had any causal role in [Nicole's death], some unknown and superseding cause necessarily precipitated the [death]" and, therefore, "the jury was entitled to infer that a superseding, entirely unforeseeable causal agent triggered Nicole's cardiac arrest."

However, the defendants draw a different conclusion than Dr. Rodgers did from his premise. They postulate a superseding cause in the place of Dr. Rodgers' conclusion that the plaintiffs' evidence was simply insufficient to establish proximate cause.

■ In our opinion, reasonable persons could infer nothing more from Dr. Rodgers' testimony than that the plaintiffs had failed to prove that Dr. Allen's negligence was a proximate cause of Nicole's death. And the jury was fully instructed that, in the absence of such proof, it should find for the defendants.

■ Next, the defendants cite Dr. Maron's testimony regarding the possible negligence of some of the other health care providers, who injected additional and unnecessary fluids into Nicole after her operation. The defendants overlook Dr. Allen's role in contributing to the more difficult conditions that gave rise to such alleged negligence. Dr. Maron testified that because of the concurrent draining of Nicole's bladder and the "dramatic shifts in the child's fluid balance" during and after the operation, it was much more difficult to determine how much additional fluid Nicole needed in her stressed condition. Applying the rationale of *Gay* and *Blankenship*, we hold

that the jury could not reasonably infer from Dr. Maron's testimony that Dr. Allen's negligence did not contribute "in the slightest degree" to cause Nicole's death.

■ As a final justification for the superseding cause instruction, the defendants cite the following testimony of Dr. Karsh:

[Dr. Allen] would certainly know that a misdiagnosis could cause harm to the patient, but he probably would be unable to specifically identify what harm it might cause. It could be anything from a larger postsurgical scar obviously to death with the likelihood of death I'm sure being very, very low on his list.

This testimony is clearly insufficient to justify the instruction. "[I]f a reasonably prudent person in the same circumstances ought to have foreseen that *some* injury might probably result" from his negligence, he need not have foreseen the precise injury that occurred to subject him to liability for such negligence. *Blondel v. Hays*, 241 Va. 467, 475, 403 S.E.2d 340, 345 (1991) (emphasis in original).

■ In summary, we conclude that none of the evidence, medical or otherwise, justifies a superseding cause instruction and that the court erred in granting the instruction. And, because the jury may have found for the defendants because of the instruction, the error was prejudicial. *Potter v. Commonwealth*, 222 Va. 606, 611, 283 S.E.2d 448, 451 (1981). Accordingly, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*