**John Witten TUNNELL, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. CIV.A. 4:03CV00074.**

United States District Court,
W.D. Virginia,
Danville Division.

Aug. 4, 2004.

Fred Dempsey Smith, Jr., James Warren Haskins, Young Haskins Mann & Gregory PC, Martinsville, VA, for plaintiff.

Barry C. Toone, Paul G. Cereghini, Bowman & Brooke LLP, Phoenix, AZ, Brian K. Telfair, Julie A. Childress, Bowman and Brooke LLP, Richmond, VA, John R. Reid, Jr., Cabaniss Smith Toole & Wiggins PL, Maitland, FL, for defendant.

## ORDER

MOON, District Judge.

Pursuant to the authority in 28 U.S.C. § 636(b)(1), this matter was referred to The Honorable Michael F. Urbanski, United States Magistrate Judge, for proposed findings of fact, conclusions and recommendations for the disposition of plaintiff John Witten Tunnell's ("Plaintiff") Motion to Exclude Pre–Accident Conduct and Cross Motion for Summary Judgment. The Report and Recommendation was entered on July 3, 2004 (the "Report and

Recommendation"). Objections to the Report and Recommendation were filed by Plaintiff on July 16, 2004. Defendant filed its response on July 26, 2004.

Plaintiff's objections fail to establish that any part of the Report and Recommendation is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ.P. 72(a). It is accordingly this day ORDERED that the Report and Recommendation of the United States Magistrate Judge, entered July 3, 2003, shall be, and it hereby is, ADOPTED in its entirety.

The Clerk of the Court hereby is directed to send a certified copy of this Order to all Counsel of Record and to Magistrate Judge Urbanski.

## REPORT AND RECOMMENDATION ON TUNNELL'S MOTION TO EXCLUDE PRE–ACCIDENT CONDUCT AND CROSS MOTION FOR SUMMARY JUDGMENT

URBANSKI, United States Magistrate Judge.

This matter is before the court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) concerning plaintiff John Witten Tunnell's motion to exclude evidence of plaintiff Tunnell's and the driver Blake Athey's pre-accident conduct and Tunnell's cross motion for summary judgment.

### OVERVIEW

In this diversity case, Virginia law governs the substantive law of products liability to be applied. Virginia does not recognize a cause of action for crashworthiness, and, as such, the circumstances of the accident, including the speed of the 1999 Mustang GT prior to the impact, should not be withheld from the jury, subject to the strictures of Fed.R.Evid. 401 and 403 concerning relevance and prejudicial impact.

The consumption of alcohol by the driver of the 1999 Mustang GT, Blake Athey, is inextricably linked with the circumstances of this accident such that the jury must be allowed to consider it in connection with Ford's misuse defense. Athey, who was working and had not slept the night before the accident, started drinking beer at band practice around 6 pm in Rocky Mount. Athey testified that he had four beers at practice and from there went to the Sports Lane bar for the purpose of attending 50 cent beer night. Although Tunnell could only account for one of Athey's beers, Athey could not testify as to how many beers he drank there. Later, Athey accompanied Tunnell to a private party at a trailer park near the accident scene. After the beer ran out there, Athey and Tunnell volunteered to drive to Eden, N.C. to get more beer. Shortly after leaving the party at the trailer, Athey's car hit a utility pole. Mindful of the prejudicial impact the introduction of this alcohol consumption may have on the jury, it is recommended that evidence of Athey's pre-collision conduct, including his consumption of alcohol, be allowed because it is relevant to the misuse defense and meets the standard for introduction of such evidence under Virginia law.

Evidence of Tunnell's alcohol consumption is another story. As the passenger in the 1999 Mustang GT, Tunnell's consumption of alcohol is not relevant to Ford's misuse defense and its prejudicial impact is likely to outweigh its probative value. It is recommended therefore that no reference be made at trial to Tunnell's consumption of alcohol prior to the impact.

Finally, as Tunnell's cross motion for summary judgment is untimely under the Court's pretrial order, it is recommended that it be denied.

### STATEMENT OF FACTS

On November 18, 1999, Plaintiff Tunnell was in the front passenger seat of a 1999

Ford Mustang GT driven by Blake Athey which collided with a utility pole in Henry County, Virginia. Tunnell suffered a broken leg and was pinned in the vehicle by the resulting damage from the collision. Some five minutes after the collision, but before Tunnell could be freed from the wreckage, a fire ignited in the passenger compartment. Tunnell, pinned inside the car for roughly forty-five minutes, was severely burned as fire engulfed the car's interior.

Tunnell brings this product liability action against Ford for breach of implied warranty and defective design as a result of his burn injuries. Tunnell claims that the 1999 Mustang GT was defective in design and unreasonably dangerous because it did not have a safety device to disconnect the battery after the collision, which he contends would have prevented the fire from starting. By means of expert testimony, Tunnell will seek to prove that the fire started in the dashboard because the wiring harness was crushed on impact. Tunnell contends that as there was no battery disconnect device or other means to shield the wires from crush damage, the still energized wires were crushed in the impact, causing an electrical event known as a high resistance fault.

Ford defends by asserting that Athey and Tunnell's misuse of the 1999 Mustang GT was unforeseeable, and that the fire did not start because of a high resistance fault in the wiring harness behind the dash. Focusing heavily on the fact that several witnesses, including Tunnell himself, described the flame as being initially blue, Ford suggests that the fire started in the passenger compartment and was ignited either by the butane lighter Tunnell had in his pocket, smoking materials and/or alcohol. As noted in the July 2, 2004 Report and Recommendation concerning Tunnell's *Daubert* motions, while there was some Coors Light beer in the car, there was no evidence that there was any flammable alcohol in the 1999 Mustang GT at the time of the accident.

As regards speed, Ford contends that Athey was speed shifting the 1999 Mustang GT and accelerated to a speed of 70–75 mph prior to the impact. Based on the expert testimony of Ford's expert, John Habberstad, the Mustang impacted the pole at approximately 45 mph.

As regards alcohol consumption, no one will testify that either Athey, the driver, or Tunnell, the passenger, were drinking at the time of the collision despite the presence of beer in the car. Athey did not sleep the night before the accident because he was working and admits that he drank four 12 oz. beers at band practice in Rocky Mount on the evening of the crash. Tunnell testified that he bought Athey one beer at 50 cent beer night at Sport Lanes bar. Athey cannot say how many beers he had as Sports Lane as he claims to recall nothing of that evening after arriving at the bar. Athey and Tunnell thereafter attended a private party at a trailer where alcohol was being served. After the beer ran out there, Athey and Tunnell volunteered to go get more beer from a convenience store in Eden, North Carolina. Shortly afterwards, Athey's 1999 Mustang GT collided with the utility pole.

According to Tunnell, no witness smelled any odor of alcohol on Athey or noticed any behavior that would suggest that Athey may have been intoxicated. No witnesses observed slurred speech, staggering gait or other unsteadiness. Tunnell testified that Athey had only one beer at Sportlanes before the accident and did not show any sign of impairment.

Ford counters by suggesting that Athey's operation of the Mustang and his erratic behavior in leaving the accident scene without trying to assist Tunnell is suggestive of impaired judgment. Ford will offer

evidence based on the blood alcohol analysis of its expert, James Valentour, that the passenger Tunnell had a blood alcohol level in a range of 0.09%–0.15% at the time of the accident. This is based on a Roanoke Memorial Hospital screen of 0.106% at the time of Tunnell's admission.

In order to properly assess the admission of the speed and alcohol evidence, salient passages from the depositions of the Athey and Tunnell depositions follow.

### A. *Deposition of Blake Warren Athey, Jr. taken December 4, 2002*

Q. How much did you have to drink at band practice?

A. I had four, four 12 ounce beers.

Athey Dep. at 43.

\* \* \* \* \* \*

Q. Before you got to his house that night—I'll just call it Tool's house. Before you got to Tool's house that night, had you had anything of any alcoholic nature to drink?

A. No.

Q. Somehow that night you ended up at the bowling alley bar, Sport Lanes bar?

A. Yes.

Q. How did you end up at Sport Lanes bar?

A. I don't know how it came about or who decided or whatever. We just ended up there, as far as I know.

Q. Did you go there with all of your band members?

A. I believe so.

Q. That was Thursday night—or excuse me—Wednesday night. Apparently it's 50 cent beer or draft beer night. Did you all know that or did that play into the decision?

A. Probably.

Q. Any recollection of what time you would have gotten to Sports Lane?

A. Sports Lanes.

Q. Sports Lanes?

A. No.

Q. Do you recall how long you were there before you ran into John Tunnell?

A. No.

Q. How much beer did you have to drink at Sport Lanes?

A. I'm not sure. I don't know.

Q. Did you have some beer to drink before you ran into John Tunnell?

A. It's possible. It's possible.

Q. Is the reason you don't—what's the reason you don't recollect?

A. The accident.

*Id.* at 44–45.

\* \* \* \* \* \*

Q. How far back did the accident affect your memory?

A. Well, that's about all I can remember. Anything after that, going to the bar, it's unclear. All the time after that until the next day. It's not there.

Q. Can you even remember being at Sport Lanes?

A. No.

Q. But you can remember being at Tool's house at band practice that night and having four beers?

A. Yes.

Q. You think you went to Sport Lanes with the members of your band, but you're not sure about that?

A. Right.

Q. Do you even remember running into John Tunnell at Sports Lanes?

A. No. Like I say, I didn't even know he was in the car until the next day.

*Id.*

\* \* \* \* \* \*

Q. Did you even know you were in a crash after the accident?

A. No. I knew something had happened, and the state trooper told me that I had had an accident.

*Id.* at 46.

\* \* \* \* \* \*

Q. Do you have any recollection of going to a party in a trailer park right near where this crash occurred?

A. No.

Q. With John Tunnell the night of the crash?

A. No.

*Id.* at 53.

\* \* \* \* \* \*

Q. Okay. Now at the band practice, I believe you stated that you had had four beers; is that correct?

A. Right.

Q. Approximately four?

A. Yeah.

Q. Right. You don't recall what time you had those beers, do you?

A. No.

Q. And I believe you already testified you don't recall really what time the band practice was over?

A. Right.

*Id.* at 80.

\* \* \* \* \* \*

Q. Now if I followed you correctly, the cut on the top of your head, you really weren't even aware that it was there?

A. No.

Q. It didn't hurt, didn't cause you any problems at all?

A. (Shakes head negatively)

Id. at 81.

**B. *Deposition of John W. Tunnell taken December 4, 2004***

Q. About how long were you at Sport Lanes?

A. Forty-five minutes.

Tunnell Dep. at 115.

\* \* \* \* \* \*

Q. Was that—probably not the current phrase—but was that a happening place that was 50 cent beer night or something, Wednesday night?

A. Right. Right.

*Id.*

\* \* \* \* \* \*

Q. Was anybody actually bowling, or is this like a bar separate from the bowling alley?

A. It's separate from the bowling alley.

Q. When you saw Blake, was he in the bar part?

A. Yes, sir.

Q. Was he drinking anything?

A. No, sir.

Q. While you were at Sports Lanes, did you ever see him drink anything?

A. Yes, sir.

Q. What did you see him drink?

A. I bought him a 50 cent draft.

*Id.* at 115–16.

\* \* \* \* \* \*

Q. Did you ask Blake if he'd had anything else to drink—not that it's your job to watch him, but did you ask him by chance if he'd been drinking that day at all?

A. No, I did not.

Q. Could you tell anything by his demeanor, slurring words, behavior, could you tell if he'd been drinking or not?

A. He looked perfectly fine.

Q. Had you ever seen Blake drink before so you'd know what fine was from drunk?

A. Yes.

*Id.* at 117.

\* \* \* \* \* \*

Q. How many beers did Blake have at Sport Lanes that you saw him have?

A. That 50 cent draft.

Q. How big was the draft?

A. Not even 12 ounces. Ten, 12 ounces, maybe.

Q. And then you just had one?

A. Yes.

Q. What time did you all leave there, approximately?

A. Close to 1.

*Id.* at 119–20.

\* \* \* \* \* \*

Q. Did you have anything to drink there?

A. No, sir.

Q. And why not?

A. There was no, no more.

Q. They were out of beer?

A. Yes.

Q. Did Blake have anything to drink there?

A. No, sir.

Q. Get one of the last ones or anything like that?

A. No, sir.

Q. I take it the subject turned to getting more beer, at some point?

A. Yes, sir.

Q. And do you remember who raised it, or was it a chorus?

A. It was just an everybody thing.

Q. What discussion do you recall about who was going to get the beer, and who was going to pay for it and where you all were going to go?

A. We said that Blake and I would go, and everybody would chip in.

*Id.* at 126.

\* \* \* \* \* \*

Q. And up until the time of the crash, you had had just the 10 or 12 ounce beer at Sport Lanes?

A. Yes, sir.

Q. That night and nothing else?

A. No, sir.

Q. How did you know to go—you all were heading towards Eden, North Carolina?

A. Yes, sir.

Q. How did you know to go there?

A. Carolina stops selling it after 2.

Q. And how about Virginia?

A. About 12.

Q. Now can you buy it inside the bar, like at the Sports Lanes?

A. Yes

Q. But you can't buy it from a store after 12?

A. Correct

*Id.* at 133–34.

\* \* \* \* \* \*

Q. When you pulled out of the stop sign from the park onto South Daniels Creek Road, did he squeal the tires?

A. Yes, sir.

Q. And was he squealing, did the squealing of the tires, was it from quick acceleration?

A. Yes, sir.

Q. As opposed to just going—You can make a tire squeal if you go round a curve real hard.

A. Yes.

Q. But he was actually burning them to spin rubber? You know what I meant by that expression?

A. Yes.

Q. Is that what he did?

A. Yes.

Q. And this was after you told him not to act stupid?

A. Yes.

*Id.* at 152–53.

\* \* \* \* \* \*

Q. Did you say anything to him after he spun the tires?

A. Yes.

Q. What did you say?

A. I begged and begged over and over for him to slow down and stop. Just repeatedly.

Q. So you not only begged that he slow down, you begged that he stop the vehicle?

A. Just stop, yes.

Q. And did he respond when you said—what were the words you used?

A. I just kept saying slow down, slow down, stop. Slow down. Just repeatedly. He didn't say anything.

Q. Did he ever acknowledge you, look at you?

A. No.

Q. Did he ever say anything to you about speed shift, or something like that?

A. Yes.

Q. What did he tell you and when?

A. That's how he was coming up out of the trailer park, putting it in neutral, revving and saying he speed shifted and stuff, whatever. Coming out of the trailer park.

Q. He said he could speed shift it coming out of the trailer park?

A. Yeah.

Q. What did you say, if anything?

A. I just told him he doesn't need to be showing me anything. I know how fast a Mustang is. I said I know how fast Mustangs are. You don't have to show me anything. Just get to the store, and that's it.

*Id.* at 153–54.

\* \* \* \* \* \*

Q. So after he says this as he's going over the speed bumps revving up the engine and he's talking about speed shift while leaving the trailer park, you said something to the effect of—what did you say again?

A. Just stop. Don't be stupid. You don't have to show me anything.

*Id.* at 155.

\* \* \* \* \* \*

Q. Before you pulled off, did you say anything more to him, like I don't need to see the speed shift, or anything like that?

A. No. I thought I made my point clear.

Q. And was it as he was pulling out that he then spins the tires?

A. Yes.

*Id.* at 156.

\* \* \* \* \* \*

Q. And then he just slammed the accelerator down to get it to spin the tires?

A. Yes, sir.

*Id.*

\* \* \* \* \* \*

Q. Did it fishtail at all coming up out of that trailer park?

A. A little bit, coming out as he turned left.

Q. When did you then start saying anything else to him about his driving?

A. Immediately.

*Id.* at 157.

\* \* \* \* \* \*

Q. And at some point in time before the crash you look at the speedometer?

A. I glanced over.

Q. And when you looked at the speedometer, what was the speed that you saw?

A. It was between 70 and 75.

Q. And you're sure you were looking at the speedometer and not the tachometer?

A. I just glanced in that general direction.

Q. And it was the speedometer you saw, the 70 to 75?

A. I'm not for sure, but that's what I thought I saw.

*Id.* at 158–59.

\* \* \* \* \* \*

Q. At that point when you looked at the speedometer, how long was that before the crash?

A. A split second, it seemed.

*Id.* at 160.

\* \* \* \* \* \*

Q. You said it was a split second before you hit the pole, before you felt the impact that you saw the speedometer?

A. I mean it happened all so quick. I saw it coming into the curve. It was coming around. That's when I glanced.

Q. And you glanced because you knew he was going fast, right?

A. Right.

*Id.*

\* \* \* \* \* \*

Q. You look over at the speedometer. You see it's between 70 and 75 and bam, the next think you know you've hit something?

A. We were fishtailing.

Q. Fishtailing?

A. Yes.

Q. Okay. How long from the time you looked at the speedometer until you felt the impact with the pole? Any idea?

A. Like I say, it could have been a split second, a second or two seconds. I'm not for sure.

Q. The only thing that happened in between looking at the speedometer and hitting the pole was you felt the vehicle fishtail?

A. Yes.

Q. By that you mean the rear end breaking loose?

A. Yes.

*Id.* at 161–62.

\* \* \* \* \* \*

Q. At any point in time after you pulled out of that trailer park and up until you all hit that telephone pole, or utility pole, whatever kind of pole it is—I don't know if it's power or telephone. Whatever it is—did he say anything, Blake Athey?

A. Just when we came out of the curve he said oh, shit. I can't handle it.

*Id.* at 163.

\* \* \* \* \* \*

Q. And the total elapsed time from the time you all had left Alan Ashwell's trailer until you hit the pole was about how much?

A. A minute and a half.

Q. Not a real long time?

A. Not long

Q. The speed limit there on that road is?

A. Thirty-five

Q. Thirty-five?

A. Yes.

Id. at 165.

## LEGAL ANALYSIS

### A. Tunnell's Motion to Exclude Evidence of Pre–Collision Conduct of Athey and Tunnell.

#### 1. Speed of the Athey Vehicle is Relevant and Admissible.

 The issue of the speed of the vehicle is relevant to the issue of unforeseeable misuse and causation which are properly questions for the jury. *Cooper Industries, Inc. v. Melandez,* 260 Va. 578, 537 S.E.2d 580 (2000) ("Generally, the question of proximate cause is an issue of fact to be resolved by a jury"); *Freeman v. Case Corp.,* 924 F.Supp. 1456, 1472 (W.D.Va.1996) ("the issue of foreseeable

misuse was properly left to the jury."). It is a question of fact in this case as to whether Athey and Tunnell misused the 1999 Mustang GT, whether the misuse was unforeseeable, and whether that misuse was the proximate cause of the accident and fire. The jury needs to consider all the facts relevant to how the collision happened to resolve the questions of fact regarding the misuse defense.

Tunnell argues that because auto collisions with poles are foreseeable, the jury need only consider evidence starting from that point, and that the circumstances of the accident are irrelevant. The opinion of the Fourth Circuit in *Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066 (4th Cir. 1974), is instructive in rejecting this notion. There, the Fourth Circuit noted:

> Were foreseeability of collision the absolute litmus test for establishing a duty on the part of the car manufacturer, the obligation of the manufacturer to design a crash-proof car would be absolute, a result that *Larsen* [*Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968)] itself repudiates. After all, "[N]early every accident situation, [involving an automobile] no matter how bizarre, is 'forseeable' if only because in the last fifty years drivers have discovered just about every conceivable way of wrecking an automobile."

*Id.* at 1070 (internal citation omitted). Indeed, even in those jurisdictions which have embraced the crashworthiness doctrine, the circumstances of the accident are factors to be considered in whether a manufacturer has designed a vehicle that protects a passenger from an unreasonable risk of harm. *Slone v. General Motors Corp.*, 249 Va. 520, 525, 457 S.E.2d 51, 53 n. * (1995). The factual questions regarding whether the operation of the 1999 Mustang GT amounted to misuse, whether that misuse was forseeable or not by Ford and whether, if unforeseeable, that misuse

was a proximate cause of the accident are all issues for the jury in this case.

Tunnell argues that because collisions are foreseeable, the circumstances leading up to the collision in this case are not admissible in evidence unless the circumstances constitute a superseding cause of the injury thereby completely cutting off any alleged breach of warranty by Ford. Tunnell asks, therefore, that all of the facts of this accident leading up to the collision not be introduced in evidence in this case because the only issue is whether Ford breached a duty in the slightest degree causing the fire in the vehicle driven by Athey.

Tunnell founds its argument on the distinction between superseding and intervening cause discussed in a line of Virginia medical malpractice cases. In *Jenkins v. Payne*, 251 Va. 122, 128–29, 465 S.E.2d 795, 799 (1996), the Virginia Supreme Court recited established precepts of causation in a negligence action as follows:

> The proximate cause of an event is that set or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred. *Beale v. Jones*, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970). There may be more than one proximate cause of an event. *Panousos v. Allen*, 245 Va. 60, 65, 425 S.E.2d 496, 499 (1993).

> In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury. *Id.; Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 131, 267 S.E.2d 143, 147 (1980); *City of Rich-*

*mond v. Gay*, 103, Va. 320, 324, 103 Va. 320, 49 S.E. 482, 483 (1905). Thus, a superseding cause of an injury "constitutes a new effective cause and operates independently of any other act, making it and it only the proximate cause of injury." *Maroulis v. Elliott*, 207 Va. 503, 511, 151 S.E.2d 339, 345 (1966).

Under Tunnell's theory, the fire started because Ford failed to equip the 1999 Mustang GT with a battery disconnect device. Tunnell contends therefore that evidence of pre-accident conduct is inadmissible because no reasonable juror could find that Ford's actions did not contribute to the fire in the slightest degree. According to Tunnell, because Athey's conduct in operating the car was at best an intervening, and not a superseding, cause of the fire, evidence of his conduct is inadmissible.

Tunnell is wrong for at least two reasons. First, Tunnell's argument begs the question. Its intervening/superseding causation argument is entirely dependent on the jury's adoption of his theory of the case. In essence, Tunnell asks the court to assume the correctness of its legal and factual theory and disallow evidence of misuse inconsistent with his theory.

Second, neither of the cases relied upon by Tunnell for this proposition support exclusion of the facts leading up to the accident. Indeed, a close examination of the facts of those cases demonstrate the fallacy of Tunnell's argument. In both the *Jenkins v. Payne* and *Atkinson v. Scheer*, 256 Va. 448, 508 S.E.2d 68 (1998), medical malpractice cases, the specific question before the court was whether an expert should be permitted to testify that a health care provider other than the defendant breached the applicable standard of care. In neither case were the facts of the treatment by the non-defendant health care providers excluded, and the jury in each case properly heard evidence as to all of the facts and circumstances of plaintiff's treatment. Moreover, these cases are conceptually distinguishable as well. For example, in *Jenkins*, a number of treating physicians were alleged to have failed to diagnose plaintiff's decedent's cancer. Because all of the doctors were subject to and allegedly failed to meet the same standard of care, a reasonable person could not conclude that the negligence of any one doctor alone caused plaintiff's death without the contributing negligence of the other doctors in the slightest degree. Likewise, in *Atkinson*, the court reversed a jury verdict for the defendant emergency room physician, ruling that it was error for the court to allow an expert to testify that it was the negligence of another emergency room doctor (who saw the patient after defendant ER doctor) that caused the death of the patient where the evidence revealed that the second doctor had relied upon the original physician's "workup" of the patient in making the decision to discharge the patient. Because the second physician relied on the negligent "workup" of the first, the court held that no reasonable juror could conclude that the second doctor's negligence alone caused the patient's death. Neither of these cases stand for the proposition that the court should assume the jury's acceptance of Tunnell's theory of the case and exclude the facts leading up to the accident as being irrelevant because they do not entirely exonerate Ford. What Tunnell's argument does not contemplate is that the jury may reject his theory that the absence of a battery disconnect device caused the fire. If the jury accepts Ford's theory of the case, then a reasonable jury could conclude that there was no breach of warranty that caused the fire in the 1999 Mustang GT "in the slightest degree." As a result, the evidence of how the collision took place, including the speed of the Athey/Tunnell vehicle, is admissible.

### 2. Athey's Consumption of Alcohol is Admissible; Tunnell's Consumption of Alcohol is Unduly Prejudicial and Therefore Inadmissible.

#### 1. Evidence of Athey's Alcohol Consumption is Admissible.

 As recounted above, there is evidence that Athey was drinking beer on the night of the accident, but the precise amount consumed is unknown as Athey cannot recall how much beer he had and was not tested that night because he disappeared from the scene. Obviously, Ford seeks introduction of the evidence concerning drinking as being relevant to its misuse defense. Tunnell argues that the evidence of drinking is irrelevant and also does not rise to the level of intoxication under Virginia law. Thus, its probative value is outweighed by its prejudicial effect under Fed.R.Evid. 403.

 Because of the likelihood of prejudicial impact, Virginia law generally requires rigorous proof to allow a jury to infer intoxication. Indeed, "[t]he mere odor of intoxicants on the breath of a person is not evidence of negligence." *Burks v. Webb. Adm'x*, 199 Va. 296, 305, 99 S.E.2d 629, 636. *See Hemming v. Hutchinson*, 221 Va. 1143, 1145–46, 277 S.E.2d 230, 232 (1981) (reversing as prejudicial error trial court's admission of evidence of intoxication absent sufficient evidence that defendant displayed other observable indications of intoxication and drank three beers seven hours before accident); *Hoffner v. Kreh*, 227 Va. 48, 51–2, 313 S.E.2d 656, 658 (1984) (affirming that trial court did not err in excluding evidence of intoxication because defendant did not so much as even smell of alcohol); *Whitson v. Middleton*, 898 F.2d 950, 952 (4th Cir.1990) (affirming defendant was legally intoxicated under Virginia statute where evidence consisted of "unsteadiness; bloodshot and glassy eyes; disheveled clothes; slow, slurred speech; and the strong odor of

alcohol on his person led to the conclusion contained in the officer's written report that Middleton was 'drinking—obviously drunk' ") *See also*, Va.Code Ann. § 4.1–100 (" *'Intoxicated'* means a condition in which a person has drunk enough beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior."), and § 18.2–266 (providing in part that intoxication for purposes of driving motor vehicle is determined by blood alcohol concentration of 0.08 or more as indicated by test).

However, the general rule in Virginia does not apply where the quantity of alcohol consumed within a relatively short period of time prior to an automobile accident is sufficient to raise an inference of intoxication. *Baker v. Taylor*, 229 Va. 66, 326 S.E.2d 669 (1985) (holding that evidence of defendant's consumption of alcohol prior to auto accident was admissible where defendant consumed numerous drinks within four hour period prior to accident and was speeding down dirt road in a hurry); *Jackson v. Prestage*, 204 Va. 481, 132 S.E.2d 501 (1963) (holding that general rule excluding evidence of alcohol consumption based on mere odor does not apply where defendant consumed four to five beers in the period of one hour and fifteen minutes of the accident, and precrash conduct was therefore properly before jury in negligence action).

In the present case, considering the evidence in light of the legal standard, the following facts support introduction of the evidence concerning Athey's alcohol consumption prior to the accident:

- Athey had four (4) 12 oz. beers at band practice in Rocky Mount, Virginia after 6:00 p.m. on the night of the accident.
- Athey and band members later went to Sport Lanes, a bowling alley and attached bar in Henry County, where it was 50 cent beer night.

- Athey has no recollection of how much beer he drank at Sport Lanes, although Tunnell testified he bought Athey one beer.
- Athey and Tunnell went to a party at another friend's trailer thereafter where alcohol was served. Athey cannot recall going to the trailer; Tunnell does not recall seeing Athey drinking at the party.
- As it is after 1:00 a.m., beer is no longer sold in Virginia. Tunnell testifies that he and Athey collect money to go to a Texaco station in Eden, North Carolina to buy more beer.
- Tunnell testifies that Athey squeals his tires and drives at a high rate of speed—70 to 75 mph—despite Tunnell's pleas to slow down or stop.
- Athey cannot recall going to the party, much less leaving it with Tunnell.
- After the collision with the pole, Athey disappears. He wakes up at a friend's house and learns of the accident from a police officer later the next morning.

The following facts support exclusion of the evidence regarding alcohol:

- Tunnell observed Athey consume only one beer at Sport Lanes and none at the trailer party.
- Tunnell, who had seen Athey drunk before, said that he seemed fine.
- Eyewitness Weaver testified that she had no indication that either Tunnell or Athey had been drinking, nor did she smell any alcohol. (Weaver Dep. at 18.)
- Eyewitness Jinright testified that she did not smell alcohol on Tunnell's or Athey's person as all she could smell was burning. (Jinright Dep. at 10.)
- The officers on the scene likewise did not smell any alcohol. (Sergeant Pruett Dep. at 14; Deputy Austin Dep. at 19; Deputy Vaughan Dep. at 25, 30.)
- Deputy Austin testified that he did not have the sense from his contact with Tunnell that there was any alcohol involved in the crash. (Austin Dep. at 19.)

The facts in this case are somewhat similar to that of *Baker v. Taylor*, 229 Va. 66, 326 S.E.2d 669 (1985), where the circuit court held that evidence of defendant's consumption of alcohol prior to the auto accident was not admissible because there was insufficient evidence of legal intoxication. On appeal, the defendant argued that because none of the witnesses testified that he had an odor of alcohol on his breath and that mere consumption of alcohol does not necessarily lead to impairment, the circuit court properly excluded evidence of alcoholic consumption. Plaintiff argued that evidence of defendant's alcohol consumption was admissible to determine his negligence either because he violated the Virginia statute prohibiting drunk driving or his ability to safely operate his car was impaired. *Id.* at 69, 326 S.E.2d 669. The defendant told the investigating state trooper that he was in a hurry to get his passengers home and took the curve on the dirt road too fast causing him to lose control and flip his truck. As a result, Baker, who was traveling in the back of the truck, died. Testimony of the witnesses confirmed that the defendant had consumed at least four to five beers and half of a glass of wine at a picnic, and that the group bought more alcohol throughout the day. There was disputed evidence that defendant may have had as many as 9–10 beers before the accident. The Supreme Court of Virginia reversed and remanded the trial court by holding that evidence of defendant's alcohol consumption was admissible. The court found that the general rule that mere odor or consumption of alcohol without more is inadmissible did not apply to this case. As such, the court reasoned "although the quantity of alcohol consumed may not be sufficient to cause a person's intoxication

in a strict penal sense, it 'may be sufficient to impair his capacity to perceive the dangers with the clarity, make the decisions with the prudence, and operate the vehicle with the skill and caution required by law.' " *Id.* at 70, 326 S.E.2d 669, *citing, Simon v. Commonwealth,* 220 Va. 412, 419–20, 258 S.E.2d 567, 572–73 (1979).

Although the question of the admission of evidence of Athey's consumption of alcohol admittedly is a close one based on the facts of this case and Virginia precedent, the probative value of Athey's pre-crash conduct and the evidence of his consumption of at least 5 beers within a few hours of the accident is sufficient to outweigh its likely prejudicial effect and should be considered by the jury. *See Baker,* 229 Va. 66, 326 S.E.2d 669; *Jackson,* 204 Va. 481, 132 S.E.2d 501; *Davis v. Sykes,* 202 Va. 952, 955, 121 S.E.2d 513, 515 ("Moreover, the jury had the right to consider whether the defendant's consumption of beer had something to do with his going to sleep" while driving his car prior to the accident.). It is recommended, therefore, that the evidence of Athey's consumption of alcohol be admitted into evidence. Similar to *Baker,* Athey had at least five beers in the hours before the accident, and quite possibly more as the point of being at Sport Lanes was that it was 50 cent beer night. Further, the entire purpose of the ill fated trip was to acquire more beer for the trailer party. Finally, Athey cannot recall any of the events of that evening after arriving at 50 cent beer night and cannot even recall Tunnell being in his car. The absence of any recollection by Athey, combined with his erratic driving leading up to the accident and his bizarre behavior of leaving the scene thereafter also supports admission of the evidence regarding his consumption of alcohol as it is relevant to the defense of misuse.

*2. Any Evidence of Tunnell's Alcohol Consumption is inadmissible under Fed.R.Evid. 401, 402 and 403.*

■ While the expert witness opinion of James Valentour does provide some information concerning the range of likely blood alcohol content of Tunnell at the time of the accident, Tunnell was not the driver of the vehicle. Whatever his blood alcohol was at the time of the accident is not relevant to the issue of unforeseeable misuse in this case. *See* Fed.R.Evid. 401–403.

■ Federal Rules of Evidence 401 to 403 provide the definition and parameters of relevant information. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In determining what is relevant evidence and whether such evidence should be admissible, the court must find that such evidence is properly provable in a case. Fed.R.Evid. 401, Advisory Committee Notes, 1972 Proposed Rules ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved?"). Similarly, Rule 402 provides that irrelevant evidence should be inadmissible, and relevant evidence is also inadmissible according to various laws in certain circumstances. As such, Rule 403 provides one law of certain circumstances that relevant evidence that is prejudicial is inadmissible. Under Rule 403, "relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of

cumulative evidence." Fed.R.Evid. 403. Under circumstances where relevant evidence may prejudice the jury, the court must balance the "probative value of and need for the evidence against the harm likely to result from its admission." *Id.* at Advisory Committee Notes, 1972 Proposed Rules. *See also, United States of America v. Hall,* 653 F.2d 1002, 1006 (5th Cir.1981).

Given that Tunnell was the passenger in Athey's vehicle, any evidence that Tunnell had consumed alcohol or was intoxicated is irrelevant to any possible aspect of Ford's defense of misuse of Athey's vehicle. Furthermore, Tunnell testified to drinking only one beer that night, had his wits about him enough to substantially plea with Athey to slow down and stop driving erratically immediately preceding the accident. Further, testimony from eyewitnesses Jinright and Weaver, (Jinright Dep. at 6, 10; Weaver Dep. at 18), and officers at the scene, (Sergeant Ronald Pruett Dep. at 50–53; Deputy Larry Austin at 19; Deputy Richard Vaughan at 25,30), corroborates Tunnell's testimony that he did not appear intoxicated and had no odor of alcohol on his breath. Although hospital records of a blood screen administered to Tunnell upon his arrival some time after the accident suggest that Tunnell consumed much more alcohol than one beer, as Tunnell was merely the passenger of the vehicle, the prejudicial impact of this evidence outweighs its probative value.

As a consequence, it is recommended on the basis of established Virginia law and the Federal Rules of Evidence 401–403, that no evidence be introduced as to the alcohol consumption of the passenger Tunnell as any such evidence is not relevant to the issue of forseeable misuse of the vehicle in regards to Tunnell. *Spurlin, Adm'x v. Richardson,* 203 Va. 984, 990, 128 S.E.2d 273, 278 (1962) ("Evidence of collateral facts, from which no fair inferences can be drawn tending to throw light upon the particular facts under investigation, is properly excluded for the reason that such evidence tends to draw the minds of the jury away from the point in issue, to excite and mislead them.") (internal citations omitted). *See also, Hill v. Lee,* 209 Va. 569, 166 S.E.2d 274 (reversing trial court and holding that insufficient evidence of intoxication of pedestrian who admitted drinking one drink fifteen minutes prior to being struck by car should not have been admitted before the jury); *Laughlin v. Rose,* 200 Va. 127, 104 S.E.2d 782 (holding evidence of intoxication as insufficient to be admissible where driver of car admitted drinking beer prior to accident and nurse testified that driver smelled like alcohol at hospital). As noted in the Report and Recommendation concerning the *Daubert* motion concerning James Valentour, evidence concerning Tunnell's consumption of alcohol may be admitted for the purpose of impeachment upon appropriate consideration of the Fed.R.Evid. 403 balance.

### 3. *Tunnell's Cross Motion for Summary Judgment.*

Plaintiff Tunnell filed its cross motion for summary judgment on June 17, 2004, less than thirty (30) days before trial. As Tunnell's cross motion for summary judgment was not timely filed under the pretrial order in this case, it is denied.

### CONCLUSION

Virginia products liability law requires the jury to consider the facts surrounding the collision unless such evidence is not admissible under Fed.R.Evid. 401 and 403. For the reasons stated herein, evidence of the speed of the Athey/Tunnell vehicle is admissible, as is evidence regarding Athey's consumption of alcohol prior to the accident. Evidence regarding Tunnell's consumption of alcohol and level of intoxication, however, are not admissible as the

prejudicial impact of this evidence is likely to outweigh its probative value.

As Tunnell's cross motion for summary judgment was not timely filed under the pretrial order in this case, it is denied.

The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.