Present:  All the Justices

PAUL HOLMES, ADMINISTRATOR OF THE
ESTATE OF ELLA HOLMES

v.  Record No. 060682  OPINION BY JUSTICE CYNTHIA D. KINSER
                                      January 12, 2007
JAY M. LEVINE, M.D., ET AL.


         FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
              Ernest P. Gates, Sr., Judge Designate

     In this wrongful-death action based on the alleged

medical malpractice of a radiologist, the plaintiff asserts

that the trial court erred by refusing to give the

plaintiff's requested jury instruction on the issue of

proximate causation.  We agree and, for that reason, will

reverse the trial court's judgment in favor of the

defendant-radiologist.  With regard to two other issues

that may arise during a retrial, we conclude that the trial

court did not err either in overruling the plaintiff's

objection that certain testimony of a treating physician

did not satisfy the requirements of Code § 8.01-399(B) or

in sustaining an objection to testimony elicited on cross-

examination of a medical expert witness concerning the

cause of death listed in a death certificate.

                   I. FACTS AND PROCEEDINGS

     Ella F. Holmes presented at a hospital emergency room

on February 19, 2003, complaining of pain in her left flank

and back.  Medical personnel performed a computed tomography (CT scan) of Holmes' abdomen, which Dr. Jay M. Levine, a radiologist employed by Commonwealth Radiology, P.C., interpreted the same day.  Dr. Levine reported that the CT scan revealed Holmes' bladder was distended, she was experiencing bilateral hydronephrosis and hydroureter, and she had a 1-2 mm calculus, or "stone," near the point where her right ureter emptied into her bladder.  Dr. Levine did not make any differential diagnosis as to the cause of Holmes' distended bladder or raise any suspicion of bladder cancer.  In March 2004, however, Holmes was diagnosed with metastatic transitional cell carcinoma of the bladder, from which she died in March 2005.

In an amended motion for judgment filed against Dr. Levine and Commonwealth Radiology, P.C., Paul A. Holmes, the spouse of the decedent and administrator of her estate (the Administrator), alleged Dr. Levine deviated from the standard of care as a radiologist by failing to recognize the markers of transitional cell carcinoma in Holmes' bladder, to recommend further studies, and to report an asymmetrical thickening of her bladder wall.  At the heart of the allegations was the contention that Dr. Levine breached his duty of care to Holmes by failing to interpret and report a gray-white area appearing on the February 2003

2

CT scan as a focal thickening of her bladder wall consistent with a mass, thereby depriving Holmes' other health care providers of vital information that would have enabled them to detect bladder cancer at an earlier stage and, in turn, to increase significantly her chance of survival.

At trial, the Administrator presented expert testimony from several witnesses to support his allegations regarding Dr. Levine. Dr. Lawrence M. Cohen, an expert in the field of radiology, testified that Dr. Levine, in interpreting the February 2003 CT scan, breached the standard of care by failing to recognize and report the thickening of Holmes' bladder wall, by failing to include that information in his report, and by failing to make a diagnosis of possible transitional cell cancer of the bladder.

Dr. David M. Pfeffer, an expert witness qualified in the field of urology, testified that a reasonably prudent urologist in 2003 who received a radiologist's report identifying a focal thickening of a patient's bladder wall suggestive of a tumor would have performed a biopsy. But, according to Dr. Pfeffer, a reasonably prudent urologist in 2003 would not, based on Dr. Levine's report of the February 2003 CT scan, have performed a biopsy on Holmes' bladder. Dr. Pfeffer opined that if a biopsy had been

3

performed in 2003 on the thickened wall of Holmes' bladder, that biopsy would have shown transitional cell carcinoma of the bladder.  He stated to a reasonable degree of medical probability that Holmes had bladder cancer in February 2003 and that the delay in diagnosis until 2004 deprived her of a substantial possibility of survival.

Dr. Samuel Denmeade, who testified on behalf of the Administrator as an expert in the field of oncology, corroborated much of Dr. Pfeffer's testimony.  Dr. Denmeade agreed that Holmes had bladder cancer in February 2003 and further stated that, based on a biopsy performed in 2004, the type of cancer was "transitional cell cancer, which is a very specific cell type that's really only found in the genito-urinary tract."  He opined that Holmes' cancer in 2003 was at the Stage II level of progression but that, when it was finally diagnosed 13 months later, it had progressed to Stage IV.  According to Dr. Denmeade, 60 to 70 percent of patients whose cancers are discovered at the Stage II level will live for five to ten years, whereas patients whose tumors remain undetected until they reach Stage IV, as occurred with Holmes, have only a 10 to 15 percent survival rate over similar periods.

In contrast, Dr. Levine claimed that the gray-white area on the February 2003 CT scan was merely normal anatomy

4

for a woman who, like Holmes, had previously undergone a hysterectomy. Specifically, he presented expert testimony that the alleged focal thickening of the bladder wall was actually Holmes' vaginal cuff, which was a normal finding that did not need to be reported by Dr. Levine in his report of the February 2003 CT scan. Moreover, Dr. Levine challenged the Administrator's evidence that Holmes had cancer in her bladder in February 2003.

In support of the latter position, Dr. Levine presented testimony from Dr. Baruch M. Grob, an expert in the field of urology and in the diagnosis and treatment of cancer involving the urinary tract. Dr. Grob opined that, based on his review of Holmes' medical records, her cancer began in her periurethral space and that in February 2003 she did not have bladder cancer. On cross-examination, the Administrator challenged Dr. Grob's conclusion by asking about the cause of death listed on Holmes' death certificate.[1] The following exchange occurred:

> Q  Doctor, Mrs. Holmes died of bladder cancer, true?
>
> A  Not in my opinion, no.

---

[1] Dr. Levine had objected to the death certificate's introduction into evidence before trial on the basis that it lacked probative value, prejudiced his defense, and contained hearsay. The record on appeal does not reflect the trial court's ruling on this pre-trial objection.

Q  You have looked at the medical records?

A  Yes.

Q  What is the cause of death on the death certificate signed by the physician?

A  Well, death certificates can only use the information they have available.

Q  What does it say, Doctor?

Dr. Levine objected to the last question, arguing that it called for hearsay and that a death certificate is not a medical record.  The trial court overruled the objection. Dr. Grob then read the cause of death listed in Holmes' death certificate:  "Bladder cancer, metastatic."

At the conclusion of his evidence, Dr. Levine renewed his objection to Dr. Grob's testimony recounting the cause of death stated in the death certificate and moved the trial court to strike that testimony because it was hearsay.  The trial court granted the motion and instructed the jury not to consider that particular testimony.

Dr. Levine also presented portions of a videotaped deposition of Dr. Nancy A. Huff, Holmes' treating urologist from November 2002 through April 2003.  Holmes initially complained to Dr. Huff about unusual urinary frequency. Dr. Huff said she obtained a urinalysis, which did not

reveal the presence of blood in Holmes' urine.[2]  Dr. Huff testified that another urinalysis performed during Holmes' emergency room visit in February 2003 showed "an occasional red blood cell per high-powered field."

Dr. Levine agreed to redact certain portions of Dr. Huff's videotaped deposition.  As relevant to this appeal, Dr. Levine redacted a question asking Dr. Huff, during direct examination, whether she considered the red blood cells in Holmes' urine to be hematuria, as well as Dr. Huff's answer: "I did not consider this to be significant hematuria.  She only had an occasional red blood cell per high-powered field."  However, Dr. Levine did not agree to redact the following exchange that occurred during the Administrator's cross-examination of Dr. Huff:

> Q  The question that was originally asked of you was whether or not at the time you considered the presence of red blood cells in the urine to be hematuria.  Your answer was you did not believe it to be significant hematuria.
>
> And my question is:  Was it hematuria?
>
> .  .  .
>
> A  I did not think that an occasional red blood cell would qualify for microscopic hematuria.

---

[2] Evidence presented by both parties established that the presence of blood in a patient's urine is correlative with the presence of bladder cancer in the patient.

In a motion in limine, the Administrator argued this exchange was inadmissible because Dr. Huff's testimony amounted to a medical diagnosis not documented in Holmes' medical records and not stated to a reasonable degree of medical probability. He also asserted that, since the question had been asked on cross-examination only as a follow-up to the earlier, redacted question by Dr. Levine, it likewise should have been redacted. In opposing the motion, Dr. Levine argued that Dr. Huff was, for the most part, reading from her records concerning Holmes and was not rendering a medical diagnosis; rather, she was testifying to observations, signs, and symptoms documented in the record, as allowed under Code § 8.01-399(B). The trial court denied the motion and admitted that portion of Dr. Huff's testimony.

After the close of all the evidence, the parties proffered jury instructions. As pertinent to this appeal, they presented differing instructions on the issue of proximate cause. The Administrator's requested instruction, identified as Instruction No. 9, read, "A proximate cause of an injury or damage is a cause which in natural and continuous sequence produces the injury or damage. It is a cause without which the injury would not have occurred. There may be more than one proximate cause

of an event."  In nearly identical terms, save the last sentence, Dr. Levine proffered Instruction No. F, which stated, "A proximate cause of a death is a cause that in natural and continuous sequence produces the death.  It is a cause without which the death would not have occurred." The trial court gave the jury Dr. Levine's instruction and the administrator objected to the failure to give Instruction No. 9.[3]

The issue of proximate cause was the subject of a question from the jury during the course of its deliberations.  Specifically, the written question read, "A jury member is deadlocked on Instruction B, Issue 2 that all other jury members are in agreement.  What is the course of action?"[4]  The trial court did not answer the question; rather, it summoned the jurors into the

---

[3] During argument at trial concerning the difference between the two proffered proximate cause jury instructions, the Administrator did not object to the wording of Dr. Levine's instruction but insisted that it should include the last sentence of his requested instruction: "There may be more than one proximate cause of an event."

[4] Instruction B advised the jury that the issues in the case were:
   (1) Did Dr. Levine fail to use the degree of skill and diligence required of a reasonably prudent radiologist practicing in the Commonwealth of Virginia in his treatment of . . . Holmes?
   (2) If so, was that failure a proximate cause of . . . Holmes' death?

courtroom, asked them whether they could reach a verdict if they deliberated further, and instructed them to go back to the jury room and answer the court's question.

When the jury returned to the courtroom, however, it had reached a verdict in favor of Dr. Levine. On the verdict form, there appeared a handwritten notation saying, "We find that Dr. Levine failed to use the degree of skill and diligence required of a reasonably prudent radiologist in the Commonwealth of Virginia in his treatment of . . . Holmes. We did not find that this failure was a proximate cause of . . . Holmes [sic] death."

The Administrator moved the trial court to set aside the jury verdict, grant judgment in his favor on the issue of liability, and order a new trial on the issues of causation and damages. The trial court denied the motion and entered judgment for Dr. Levine in accordance with the jury verdict. The Administrator appeals from that judgment.

## II. ANALYSIS

On appeal, the Administrator raises four assignments of error. In the first assignment of error, the Administrator challenges the trial court's evidentiary

---

(3)   If the plaintiff is entitled to recover, what is the amount of his damages?

ruling admitting Dr. Huff's testimony about hematuria. The trial court's evidentiary ruling striking Dr. Grob's testimony about the cause of death listed in the death certificate is the subject of the second assignment of error. The third assignment of error contests the trial court's refusal to give the Administrator's jury instruction on the issue of proximate causation, and the fourth assignment of error attacks the sufficiency of the evidence. With regard to the third assignment of error, we conclude the trial court committed reversible error and that we must therefore remand this case for a new trial. We will also address the first and second assignments of error since they present issues that may arise again upon retrial. See Lopez v. Dobson, 240 Va. 421, 424, 397 S.E.2d 863, 865 (1990) (addressing issue that may arise again upon retrial).

## A. Proximate-Cause Jury Instruction

The Administrator argues the trial court improperly refused to grant a jury instruction that would have enabled him to argue to the jury that it did not need to find Dr. Levine's alleged negligence was the only proximate cause of Holmes' death. For his part, Dr. Levine contends the instructions granted by the trial court, taken together, sufficiently advised jurors that the Administrator had to

11

prove only that Dr. Levine's breach of the standard of care was "a" proximate cause of Holmes' death.[5]

As we have made clear in the past, "[a] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." Schlimmer v. Poverty Hunt Club, 268 Va. 74, 78, 597 S.E.2d 43, 45 (2004); accord Honsinger v. Egan, 266 Va. 269, 274, 585 S.E.2d 597, 600 (2003). The evidence introduced in support of a requested instruction "must amount to more than a scintilla." Schlimmer, 268 Va. at 78, 597 S.E.2d at 45 (citing Justus v. Commonwealth, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981)). "If a proffered instruction finds any support in credible evidence, its refusal is reversible error." McClung v. Commonwealth, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975).

The Administrator's position at trial was that there were two proximate causes of Holmes' death: the cancer itself and, separately, the delay in diagnosis occasioned by Dr. Levine's alleged breach of the standard of care, which deprived Holmes of a significantly better chance of survival. Both factors find support in the evidence

---

[5] We observe that Dr. Levine did not argue this point at trial. To the contrary, he asserted that "there can be

admitted at trial, which we review in the light most favorable to the refused instruction's proponent. Honsinger, 266 Va. at 274, 585 S.E.2d at 600. The testimony of Drs. Pfeffer and Denmeade clearly provided "more than a scintilla" of evidence to support the Administrator's theory of his case. Both opined that the delay in diagnosing Holmes' cancer caused by Dr. Levine's failure to report the focal thickening in Holmes' bladder significantly reduced her chance of survival. Further, the Administrator's requested instruction was an accurate statement of settled law in Virginia holding, "There may . . . be more than one proximate cause of an event." Panousos v. Allen, 245 Va. 60, 65, 425 S.E.2d 496, 499 (1993).

Dr. Levine, however, argues that the additional sentence in the Administrator's version of the proximate-cause instruction would have been duplicative of other instructions given by the trial court. He contends the use of the indefinite article "a" to modify the element of proximate cause in other jury instructions fully covered the principle of law and adequately apprised the jury that it could find Dr. Levine liable notwithstanding the possibility of other proximate causes of Holmes' death. A

only one proximate cause of [Holmes'] death."

closer look at the record reveals, however, the trial court also used the definite article "the" when instructing the jury that "[t]he burden is upon the plaintiff to prove by a preponderance of the evidence that Dr. Levine was negligent and that any such negligence was the proximate cause of the death of . . . Holmes." Thus, we cannot say that the granted instructions fully and fairly covered the principle of proximate causation as it pertained to the evidence in the record. See Poliquin v. Daniels, 254 Va. 51, 59, 486 S.E.2d 530, 535 (1997) (a trial court does not abuse its discretion by refusing to give a jury instruction related to the same legal principle that is fully and fairly covered by other instructions).

In light of the Administrator's theory of the case and the evidence in support of that theory, we conclude that the trial court erred by refusing to include in the instruction on proximate cause the additional sentence requested by the Administrator. For that reason, we must remand this case for a new trial.

### B. Dr. Huff

The Administrator argues that Dr. Huff's testimony stating she "did not think that an occasional red blood cell would qualify for microscopic hematuria" was inadmissible under Code § 8.01-399(B). Consequently, he

14

contends the trial court committed reversible error when it admitted the testimony into evidence, and again when it failed to correct the problem by setting aside the verdict and ordering a new trial.  In relevant part, Code § 8.01-399(B) states:

> If the physical or mental condition of the patient is at issue in a civil action, the diagnoses, signs and symptoms, observations, evaluations, histories, or treatment plan of the practitioner, obtained or formulated as contemporaneously documented during the course of the practitioner's treatment, together with the facts communicated to, or otherwise learned by, such practitioner in connection with such attendance, examination or treatment shall be disclosed but only in discovery pursuant to the Rules of Court or through testimony at the trial of the action. . . . Only diagnosis offered to a reasonable degree of medical probability shall be admissible at trial.

At issue in this appeal are the portions of this subsection referring to "diagnoses, signs and symptoms, observations, evaluations, histories, or treatment plan" that are "contemporaneously documented during the course of the practitioner's treatment" and the requirement that a diagnosis must be "offered to a reasonable degree of medical probability" in order for it to be admissible at trial.  Code § 8.01-399(B) (emphasis added).  The Administrator contends that the portion of Dr. Huff's testimony at issue was not contemporaneously documented in Holmes' medical records and constituted a diagnosis not

15

offered to a reasonable degree of medical probability.  For both reasons, the Administrator argues the testimony was inadmissible.  Dr. Levine contends the challenged testimony was not a medical diagnosis but, instead, merely reflected Dr. Huff's impressions and conclusions reached during her treatment of Holmes.  Dr. Levine also argues that the absence of a notation in the medical records about hematuria did not render Dr. Huff's testimony inadmissible.

In Pettus v. Gottfried, 269 Va. 69, 606 S.E.2d 819 (2005), we addressed both of these statutory provisions.[6] In that wrongful-death case, the plaintiff alleged that the defendant-doctor misdiagnosed the decedent's chest pain and negligently discharged the decedent from a hospital emergency room.  Id. at 73, 606 S.E.2d at 822.  A few days later, a cardiologist admitted the decedent to the hospital although the decedent was free of chest pain at that time. Id. at 72, 606 S.E.2d at 822.  The next morning, the decedent's mental status became a matter of concern, and after the cardiologist ordered a neurology consultation,

---

[6] Since our decision in Pettus, the General Assembly amended Code § 8.01-399(B).  2005 Acts chs. 649, 692.  As pertinent to the case before us, the first sentence in the prior version of Code § 8.01-399(B) referred only to documentation of a practitioner's "diagnosis or treatment plan."  The General Assembly did not make any changes in the language that "[o]nly diagnosis offered to a reasonable

the decedent had a seizure and died.  Id. at 72–73, 606 S.E.2d at 822.  The defendant introduced the cardiologist's deposition testimony, which stated that, during the course of treating the decedent, the cardiologist formed an opinion that the cause of the abrupt change in the decedent's mental status could have been "a central nervous system event."  Id. at 73, 77, 606 S.E.2d at 822, 824.

The plaintiff argued that the cardiologist's testimony that the decedent's mental disorientation "could have been" a central nervous system event was inadmissible because it was a diagnosis not offered to a reasonable degree of medical probability.  The plaintiff also asserted that the testimony was inadmissible because it deviated from the cardiologist's entries in the decedent's medical records. We rejected both arguments.

First, we concluded that the testimony, which was given in response to the defendant's question about whether the cardiologist had formed an opinion about the cause of the decedent's change in mental status, "was factual in nature because it served to explain the impressions and conclusions [the cardiologist] reached while treating [the decedent]."  Id. at 77-78, 606 S.E.2d at 824-25.  We

---

degree of medical probability shall be admissible at trial."  Code § 8.01-399(B).

17

further stated that the testimony was neither an expert medical opinion offered at trial nor a diagnosis. Id. at 78, 606 S.E.2d at 825. Thus, we concluded the challenged testimony "was not subject to the general rule that a medical expert opinion must be rendered to a reasonable degree of medical probability." Id.

We reach the same conclusion with regard to the challenged portion of Dr. Huff's testimony. Her testimony, like that of the cardiologist in Pettus, must be read in context. Dr. Huff testified that the February 20, 2003 urinalysis showed "an occasional red blood cell per high-powered field." Her subsequent testimony, stated in the past tense and in response to the Administrator's question whether the level of red blood cells present in Holmes' urine specimen was hematuria, reflected Dr. Huff's impression reached at the time she was treating Holmes. Like the cardiologist in Pettus, she was not offering a diagnosis or her present medical expert opinion about the clinical significance of the results of Holmes' urinalysis. Instead, she was merely stating that, at the time she received the urinalysis results, she did not think the presence of a few red blood cells in Holmes' urine was clinically significant or tantamount to microscopic hematuria.

18

In Pettus, we further disagreed with the plaintiff's argument that the cardiologist's testimony deviated from the entries in the relevant medical records. Id. at 78, 606 S.E.2d at 825. As we explained, the decedent's medical records prepared by the cardiologist referred "to the possibility of a central nervous system embolic event." Id. We concluded that any difference between the "written entry and [the cardiologist's] testimony did not affect the admissibility of the testimony."[7] Id. While the plaintiff argued that Code § 8.01-399(B) limited the scope of admissible trial testimony by a treating physician, it was not necessary to decide that issue because, as already noted, the documentation in the decedent's medical records mentioned a central nervous system event.

Similarly, in the case before us, it is not necessary to determine whether the provisions of Code § 8.01-399(B) merely specify the nature of confidential physician-patient information that must be disclosed in discovery or through trial testimony when a patient's physical or mental condition is at issue in a civil action or whether the statute states an outside limit on the scope of trial

---

[7] With regard to an objection in Pettus that another treating physician's testimony was not admissible under Code § 8.01-399(B), there was an inadequate record on

testimony by a treating physician.  This is so because the results of the February 20, 2003 urinalysis were in Holmes' medical records and showed only a "trace" of blood in her urine.[8]  As in Pettus, any distinction between the documentation in Holmes' medical records and Dr. Huff's testimony that the presence of a few red blood cells did not qualify as microscopic hematuria "did not affect the admissibility of the testimony but was a proper subject for cross-examination of the witness."  269 Va. at 78, 696 S.E.2d at 825.  Thus, we conclude that the trial court did not abuse its discretion in admitting the challenged portion of Dr. Huff's deposition testimony.[9]  See Gray v. Rhoads, 268 Va. 81, 86, 597 S.E.2d 93, 96 (2004) ("A trial court's exercise of discretion to admit or exclude evidence will not be overturned on appeal unless the court abused its discretion.")

## C. Cause of Death

The Administrator claims the trial court properly applied Code § 8.01-401.1 when it initially allowed Dr.

appeal to address the merits of the argument.  269 Va. at 81, 606 S.E.2d at 827.

[8] We note that one of Dr. Levine's expert witnesses testified that blood in the urine is synonymous with the term "hematuria."

[9] We find no merit in the Administrator's argument that the challenged portion of Dr. Huff's testimony should not

Grob to testify about the cause of death set forth in Holmes' death certificate, but that it erred when it later reversed its decision and directed the jury to disregard that testimony.  He argues that, since Dr. Grob testified he had reviewed Holmes' medical records in the course of arriving at his conclusions that she did not have bladder cancer in February 2003 and that the cancer originated in her periurethral space, the provisions of Code § 8.01-401.1 permit an inquiry on cross-examination into "the . . . facts or data" underlying Dr. Grob's opinions, especially those that did not support his conclusions.[10]  Further, the Administrator contends that Dr. Levine's objection, predicated on our holding in McMunn v. Tatum, 237 Va. 558, 379 S.E.2d 908 (1989), was misplaced because, according to the Administrator, that decision restricted an expert witness from testifying only during direct examination as to hearsay matters of opinion upon which the expert relied in reaching his own opinion.

---

have been admitted simply because Dr. Levine agreed to redact other portions of her testimony on the same subject.

[10] This Court has held that a death certificate is not "competent to show the cause of [a] decedent's death" because, when offered for that purpose, it merely represents "the expression of an opinion by the physician signing the certificate."  Edwards v. Jackson, 210 Va. 450, 453, 171 S.E.2d 854, 856 (1970).

To resolve the issue about Dr. Grob's testimony, we need not determine the extent of the holding in McMunn because the contents of the death certificate were not facts or data upon which Dr. Grob relied in forming his opinions.  The relevant statute states, in pertinent part:

> In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify.  The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Code § 8.01-401.1 (emphasis added).  The record is devoid of any evidence that Dr. Grob relied on the death certificate and its statement as to the cause of Holmes' death in forming his opinions about which he testified. The only foundation laid by the Administrator for introducing the cause of death stated in the death certificate was that Dr. Grob had "looked at the medical records."  From his comment that "death certificates can

22

only use the information they have available," it is clear that Dr. Grob discounted the document's persuasiveness and did not rely upon it in forming his opinions. Thus, we conclude the trial court did not abuse its discretion in striking Dr. Grob's hearsay testimony.[11] Our conclusion, however, does not mean that the Administrator was precluded from cross-examining Dr. Grob about whether he relied on the death certificate in formulating his opinions and, if not, why he discounted the information contained in the death certificate.

CONCLUSION

For the reasons stated, we will reverse in part, and affirm in part, the circuit court's judgment and remand the case for a new trial on all issues consistent with the principles expressed in this opinion.[12]

Reversed in part,
affirmed in part,
and remanded.

---

[11] We reject the Administrator's argument that the trial court's striking that portion of Dr. Grob's testimony deprived him of the opportunity to test Dr. Grob's credibility and to cross-examine him for bias.

[12] In light of our decision, we do not address the Administrator's fourth assignment of error.