PRESENT:  All the Justices

NANCY WHITE SMITH, PERSONAL REPRESENTATIVE
OF THE ESTATE OF SANDS SMITH, JR., DECEASED

v.    Record No. 080939      OPINION BY JUSTICE CYNTHIA D. KINSER
                                        APRIL 17, 2009
BYUNGKI KIM, M.D., ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael P. McWeeney, Judge

In this wrongful death action, the sole issue we consider

is whether the circuit court erred in denying a jury instruction

proffered by the plaintiff.  Because the instruction is not a

correct statement of the law, as it removes a question of fact

from the jury, we conclude the circuit court did not err in

refusing to give the instruction.  Thus, we will affirm the

circuit court's judgment in favor of the defendants.

MATERIAL FACTS AND PROCEEDINGS

Sands Smith, Jr. (Sands), was admitted to a hospital on

February 1, 2004 for stomach pain, vomiting, and constipation.

After a CT scan revealed severe constipation, Sands received

several enemas to alleviate his problem.  The next day, a

gastroenterologist evaluated Sands and ordered a colonoscopy.

The doctor also ordered one gallon of GoLYTELY[1] for Sands to

drink and two more enemas, if necessary, in order to prepare

Sands' colon for the procedure.

_____

[1] GoLYTELY, also known as "polyethylene glycol," is a
standard bowel preparation for a colonoscopy.

On February 3, 2004, Nader H. Balba, M.D., attempted to perform the colonoscopy on Sands, but encountered semi-solid stool that prevented adequate visualization of the colon lining. Dr. Balba ordered a second colonoscopy for the following day and another gallon of GoLYTELY for Sands to drink. Sands was able to consume only one-half of the second gallon of GoLYTELY. He also had three more enemas.

The next day, Byungki Kim, M.D., performed the second colonoscopy. Although he did not encounter stool that impeded visualization of the colon lining, Dr. Kim had to terminate the procedure because he found "severe diverticulosis and [a] sharp angulation" in Sands' colon.

During the second colonoscopy, Sands vomited feculent-smelling material and aspirated some of it into his lungs. His blood-oxygen level dropped to 82 percent. Sands developed severe respiratory distress and was placed on a ventilator.

Barry F. Walter, M.D., conducted an emergency surgical consultation with Sands. Dr. Walter noted Sands' "hugely distend[ed] abdomen," which he believed was impacting Sands' ventilation. Because he was also concerned that Sands had a perforated colon, Dr. Walter performed emergency exploratory surgery. Although he did not find any colon perforation, Dr. Walter discovered "a very distended colon and [an] inflammatory appearing mass." Consequently, Dr. Walter removed a segment of

2

Sands' colon and performed a colostomy.  After his emergency surgery, Sands developed acute respiratory distress syndrome (ARDS)[2] and aspiration pneumonia.  Sands was eventually discharged from the hospital and spent several weeks in a rehabilitation center before returning home.

In January 2005, Dr. Walter surgically reversed Sands' colostomy.  After the procedure, Sands developed "a colocutaneous fistula, or a leak, from the colon out to the skin."  After non-surgical measures failed to resolve the fistula, Sands had to undergo three additional surgical procedures to close the fistula.

On May 26, 2005, Sands was again admitted to a hospital for shortness of breath and a fever.  He was diagnosed with pneumonia, respiratory distress, and sepsis.  Two days after he entered the hospital, Sands died.  According to autopsy results, Sands' cause of death was "ARDS [and] acute ischemia of the heart."

Nancy White Smith, as the personal representative of Sands' estate (Smith), filed a wrongful death action against Dr. Kim, Dr. Balba, and their employer, Gastroenterology Associates of

---

[2] ARDS is a "hylan membrane disease, an inflammatory process throughout [the] lungs."

Northern Virginia, LTD (collectively the Doctors).[3]  Among other things, Smith alleged the Doctors breached the standard of care by failing to timely diagnose and treat Sands' bowel obstruction and inappropriately conducting colonoscopies, which caused Sands to aspirate his stomach contents and/or fecal matter into his lungs.  Smith further alleged the aspiration led to the development of ARDS and other medical problems, which ultimately and proximately caused Sands' death.

During the course of a jury trial, Smith presented medical expert testimony regarding the Doctors' breach of the standard of care and the proximate cause of Sands' death.[4]  Louis Lambaise, M.D., an expert in the field of gastroenterology, testified that Dr. Balba breached the standard of care when he ordered a second gallon of GoLYTELY, as he should have suspected an abdominal obstruction because the enemas and the first gallon of GoLYTELY were not effective.  Dr. Lambaise opined that Dr. Kim breached the standard of care because "a colonoscopy was performed despite evidence of abdominal distension and a risk of aspiration."  Dr. Lambaise testified that the cause of Sands'

---

[3] Smith also named Mitchell Tobias, M.D., who was the anesthesiologist who participated in the second colonoscopy, and his employer, Fairfax Anesthesiology Associates, Inc., as defendants but later nonsuited them.

[4] The Doctors likewise presented expert medical testimony, but it is not necessary to summarize that evidence in order to resolve the issue before us.

aspiration was the large amount of GoLYTELY he had ingested along with the pressure applied to his stomach area by a nurse.[5] Finally, Dr. Lambaise opined that if the Doctors had done certain things to comply with the standard of care, Sands would not have aspirated and he would not have been taken to emergency surgery in the condition in which Dr. Walter found him.

An expert in the field of critical care and pulmonary medicine, Stuart Jacobs, M.D., testified that the first episode of ARDS left Sands with "significant, long-term damage" to his lungs. Dr. Jacobs explained that "ARDS is a very severe lung injury, and . . . survival of it is often 50 percent or less." Continuing, Dr. Jacobs opined that Sands' long-term lung damage from his first case of ARDS proximately contributed to his death. Dr. Jacobs further opined that, if Sands had not aspirated during the second colonoscopy, he likely would not have developed the first episode of ARDS. Finally, Dr. Jacobs opined that Sands' chances of surviving the second episode of ARDS were "essentially none" because his lung function, at that point, was half of what it should have been due to the aspiration and first episode of ARDS.

---

[5] Dr. Tobias, testifying on behalf of Smith, stated that at the time Sands vomited the feculent-smelling material, "there were four clenched fists pushing on [Sands'] abdomen."

5

After Smith and the Doctors concluded their presentation of evidence, Smith requested the circuit court to give, among others, Instruction No. 18 to the jury:

> If you believe from the evidence that Mr. Sands Smith Jr., exercised ordinary care in selecting physicians for treatment of the injuries he sustained as a result of the colonoscopy performed on 02/04/04 and you further believe that Mr. Sands Smith Jr., sustained additional injuries, including death, as a result of such medical treatment, whether performed negligently or not, then you are instructed that the law considers the additional injuries, including death to be an aggravation that naturally flows from the original injuries, and the Plaintiff may recover for such aggravation from the person legally responsible for causing the original injuries.

The circuit court refused to give the instruction.[6]

The jury returned a verdict in favor of the Doctors. Smith filed a motion to set aside the verdict and grant a new trial

---

[6] Smith also requested the circuit court to give Instruction No. 15. In their respective briefs, the parties quote an Instruction No. 15, but the quoted instruction is different than an instruction numbered 15 contained in the record from the circuit court. Since the instruction quoted in the parties' briefs is not a part of the record in this case, we will not consider it or Smith's arguments that the circuit court erred by refusing to give that particular instruction to the jury. See Prince Seating Corp. v. Rabideau, 275 Va. 468, 470, 659 S.E.2d 305, 307 (2008) ("We cannot review the ruling of a lower court for error when the appellant does not . . . provide us with a record that adequately demonstrates that the court erred."); Pettus v. Gottfried, 269 Va. 69, 81, 606 S.E.2d 819, 827 (2005) (noting an appellant "is charged with the responsibility of presenting an adequate record from which the appellate court can determine the merits of [the] argument"); Justis v. Young, 202 Va. 631, 632-33, 119 S.E.2d 255, 257 (1961) (reiterating that we consider a case based on the record sent to us from the lower court).

6

based, in part, on the circuit court's failure to give Instruction No. 18.  The circuit court denied Smith's motion and entered final judgment in favor of the Doctors.

Smith appeals from the circuit court's judgment, arguing the court erred by refusing to give Instruction No. 18.

ANALYSIS

"A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law."  Schlimmer v. Poverty Hunt Club, 268 Va. 74, 78, 597 S.E.2d 43, 45 (2004); accord Holmes v. Levine, 273 Va. 150, 159, 639 S.E.2d 235, 239 (2007); Monahan v. Obici Med. Mgmt. Servs., Inc., 271 Va. 621, 636, 628 S.E.2d 330, 339 (2006); Honsinger v. Egan, 266 Va. 269, 274, 585 S.E.2d 597, 600 (2003).  "When we review the content of jury instructions, our 'sole responsibility . . . is to see that the law has been clearly stated.'"  Hancock-Underwood v. Knight, 277 Va. 127, 131, 670 S.E.2d 720, 722 (2009) (citations omitted).  Determining whether a proffered jury instruction accurately states relevant legal principles is a question of law reviewed de novo on appeal.  Id.

Smith contends she advanced at trial the theory that the Doctors were negligent in their treatment and care of Sands, causing him to have a weakened lung condition that was aggravated by subsequent, negligent medical treatment.

7

According to Smith, proffered Instruction No. 18 correctly stated the law regarding aggravation of an original injury.  In that regard, "[t]he general rule is that if an injured person uses ordinary care in selecting a physician for treatment of his injury, the law regards the aggravation of the injury resulting from the negligent act of the physician as a part of the immediate and direct damages which naturally flow from the original injury."  Corbett v. Clarke, 187 Va. 222, 224-25, 46 S.E.2d 327, 328 (1948); accord Washington v. Williams, 215 Va. 353, 357, 210 S.E.2d 154, 157 (1974); Powell v. Troland, 212 Va. 205, 212, 183 S.E.2d 184, 188 (1971); Fauver v. Bell, 192 Va. 518, 522, 65 S.E.2d 575, 578 (1951).  The rationale underlying this rule is "that the aggravation of [an] injury by the negligent treatment of [a] physician is a result that might reasonably have been anticipated" by the original tortfeasor. Corbett, 187 Va. at 225, 46 S.E.2d at 328; accord Powell, 212 Va. at 212, 183 S.E.2d at 188.

In Powell, the plaintiff had been involved in an automobile accident and underwent surgery for an injury sustained in the accident.  212 Va. at 206, 183 S.E.2d at 185.  The plaintiff claimed the surgeon was negligent in the performance of the operation, and as a result of that negligence, the plaintiff had to immediately undergo additional surgery to remove a small hemorrhage resting on the spinal cord.  Id.  The pressure of the

8

hemorrhage on the spinal cord caused the plaintiff to sustain some permanent physical impairment.  Id. at 206-07, 183 S.E.2d at 185.

The issue in Powell was whether the plaintiff, who had received a monetary judgment against the original tortfeasor in an action where issues concerning the original injury and the physician's alleged negligent aggravation of that injury were submitted to the jury, could nevertheless maintain an action against the physician.  Id. at 209, 183 S.E.2d at 186-87.  In concluding that the action against the physician was barred by the plaintiff's judgment against the original tortfeasor, we agreed with the circuit court's holding that there was no "separability" of the physician's negligence from the negligence of the original tortfeasor.[7]  Id. at 212, 183 S.E.2d at 189.  In other words, the injury caused by the original tortfeasor's negligence was aggravated by the subsequent treating physician's negligence.

In Corbett, the plaintiff had a tooth extracted, but the dentist left the root in the gum and refused to provide further

_____

[7] After this Court's decision in Powell, the General Assembly enacted Code § 8-368, the predecessor to current Code § 8.01-443.  The current version of the statute provides that when a plaintiff obtains a judgment against one of several alleged joint tortfeasors and the judgment is satisfied, the other joint tortfeasors are discharged, except with respect to any possible contribution claim by the paying tortfeasor against the other joint tortfeasors.

9

treatment.  187 Va. at 226, 46 S.E.2d at 329.  A second dentist removed the root from the gum but also extracted a second tooth and sewed up a foreign object in the socket.  Id.  In an action against the second dentist, the trial court sustained the dentist's plea of release based on the plaintiff's settlement of her claim against the first dentist and execution of a release for the injuries the first dentist inflicted.  Id. at 224, 46 S.E.2d at 327-28.  We reversed, holding that whether the injuries caused by the two dentists were separate and distinct, or inseparable, was a matter of proof.[8]  Id. at 230, 46 S.E.2d at 330-31.  In doing so, we recognized that if subsequent negligent acts could not be reasonably anticipated, there are two separate and distinct torts, not a mere aggravation of the original injury.  To hold otherwise "would strain the usual and normal concept of 'proximate cause' to the breaking point."  Id. at 226, 46 S.E.2d at 329.

One important principle, among several, can be gleaned from the decisions in Powell and Corbett: "Whether the

_____

[8] Both the current and prior versions of Code § 8.01-35.1 contain express provisions on the effect of a plaintiff's execution of a release or covenant not to sue as to one of multiple alleged tortfeasors.  Factual issues may arise under the statute as to whether the same injury or property damage is covered in a prior settlement.  See Accordia of Virginia Ins. Agency v. Genito Glenn, L.P., 263 Va. 377, 388-90, 560 S.E.2d 246, 252-53 (2002); Tazewell Oil Co. v. United Virginia Bank, 243 Va. 94, 115, 413 S.E.2d 611, 622-23 (1992).

10

physician's negligent acts cause a mere aggravation of the original injury or cause instead a separate and distinct injury should, as a general rule, be left to the determination of a jury, guided by ordinary principles of proximate cause." Washington, 215 Va. at 357, 210 S.E.2d at 158. Smith's proffered Instruction No. 18 violates this principle. The instruction directs a jury that "the law considers the additional injuries, including death to be an aggravation that naturally flows from the original injuries[.]" The proffered instruction withdraws from the jury an important question of fact – whether the additional injuries sustained as a result of subsequent medical treatment are indeed an aggravation of the original injuries, as opposed to separate and distinct injuries. Thus, proffered Instruction No. 18 is not a correct statement of law.[9] See id.; Bear v. Bear, 131 Va. 447, 454, 109 S.E. 313, 315 (1921) (holding a jury instruction was plainly wrong because it "took away from the jury the consideration and determination of an important question of fact upon which different conclusions might have been reached by reasonable men upon the evidence adduced").

---

[9] Contrary to Smith's assertion, Instruction No. 18 does not follow Restatement (Second) of Torts, § 457 (1965). Thus, we express no opinion on whether the Restatement section is in accord with the law of the Commonwealth.

CONCLUSION

Since proffered Instruction No. 18 is not a correct statement of law, the circuit court did not err by refusing to grant it.[10]  Thus, we will affirm the circuit court's judgment.

Affirmed.

---

[10] In light of our holding, it is not necessary to decide whether Smith presented sufficient evidence to warrant a jury instruction on her theory of the case.